All rise. The Illinois Court of Individuals is now in session. The Honorable Justice Magnan of the Individuals is out. Good morning, folks. Please be seated. We'll have the clerk call our next case. 1-240-2386 v. Christie v. Wright Okay. Good morning, counsel. We have a lot of 20 minutes aside for argument along with 5 minutes for rebuttals. You don't need to, the appellant doesn't need to reserve any extra time. So, with that, we'll get started. And please keep in mind that we've reviewed the briefs and the record and the authorities cited therein. Take that into account with your remarks. And our microphone doesn't really amplify, it just records, so keep your voice up if you can. Whenever you're ready. Good morning. May it please the court, my name is Shea Saba and I represent the defendant appellant, Christina Wright. Ms. Wright was convicted on testimony that never addressed the crime charge through a procedure that violated her constitutional right to confrontation with counsel who failed to protect her at the moments that mattered. This court should reverse her conviction, remand her new trial, and correct the sentencing error. While this case has a lot of facts, it also is silent on and missing a lot of critical information. This is what we do know from the record. Ms. Watanabe was an aging woman with no living family who discovered she had quite a bit of money and did not want to leave it in a mess when she died. She told Merrill Lynch this was her intention before any legal proceeding and Merrill Lynch noted she was very lucid and clear. She acted on the intention by giving monetary gifts to 11 people, including Ms. Wright, writing checks with memos like happy birthday and gift. Ms. Watanabe transferred large sums between her personal accounts to which Ms. Wright had no access, conducted transactions by agent both over the phone and in person. She knew how to online bank and the joint account between herself and Ms. Wright was opened with her own tax identification number. The same way she opened all her other personal accounts. Ms. Watanabe had a documented pattern of signing legal documents and forgetting about them. In August 2018, she executed a DNR, a living will, a power of attorney, a trust, and beneficiary designations and by September 2018, she could not recall any of them, about a month later. The Guardian report also confirms she recalls seeking assistance from a staff member with financial matters and online banking. Now, your honors, to what the state failed to prove and what the record does not show. The state never proved that anyone other than Ms. Watanabe transferred money between her accounts. This includes all the transactions not only between the joint account, but also between her personal accounts, where she wrote checks to herself to give it to another account that she owned specifically. The state referenced accounts and transactions that involved two other banks. Those banks were Chase Bank and TCF Bank throughout the trial, but they never produced a single record from those institutions. The Bank of America representative Krukowski could only read the records that were presented. He could not explain which transactions resulted in the alleged exploitation or why. He had no personal knowledge, which he admitted. Only Ms. Watanabe could speak to the specific transactions and what occurred. Neither Krukowski nor Attorney Shuman had direct evidence that Ms. Wright committed any offense against Ms. Watanabe. The state called no other witnesses from symphony residents, no nurses, no staff, no one to corroborate this alleged exploitation. The only person who could prove or disprove the state's case was Grace Watanabe, and she was gone. Do you disagree that there was a total transfer of about $150,000 from Ms. Watanabe to your client over the course of these dealings? Well, Your Honor, I think that goes to the primary question of it's not how much Ms. Watanabe remembers gifting, but did the state prove that it was Ms. Wright that was conducting that alleged misconduct? Didn't you stipulate two amounts? Yes, Your Honor. The question is a simple factual question. What's the dollar amount? What's the dollar amount, Your Honor? It was $160,000 if I remember correctly. That was the dollar amount that was alleged. That was stipulated. That was transferred. Whether it was theft or deception or all those questions aside, there was in fact a transfer of $160,000. There was a transfer, but that goes back to banks move money all the time, and if the state did not prove who transferred that, Your Honor, which is part of the primary issue in this case, having to do specifically with this sufficiency, was that the state never proved that Ms. Wright touched Ms. Watanabe's accounts. So while they presented this number, they never actually gave further information, and the only person that could give further information was Ms. Watanabe herself. Krukowski presented those records, but he could not speak to why the switch transferred, perhaps what was going on. Any of those things needed to be answered by Ms. Watanabe or by the agent that helped conduct that transfer, because Krukowski did confirm for us that identification needed to be made to do those transfers and that no one reported anything suspicious at those. Well, your client made several phone calls to the bank. True? Yes, Your Honor. And your client submitted two written, what purported to be authorizations to the bank. True? Yes, Your Honor. Two things were submitted, and that goes also into the sufficiency where the state calls this letter a forgery. However, Attorney Schuman did admit that his official notary seal, his signature, and his business card were on Exhibit 2, which is the notarized letter, as I will be referring to. Excuse me, sir? He testified that he never put it there, that he had nothing to do with it, he'd never seen that letter before. This is a sufficiency challenge, right? So we take the evidence in the light most favorable to the state, right? Yes, sir. In your recitation, it seems like we're glossing over, maybe just wholly omitting, some pretty damaging facts. Your Honor, while they might be damaging in one inference, there also is the second inference, which is just as plausible, that he did not keep records. Well, you lose on that. At this point. At this point? I mean, at this point. Because we have to take it. If there's two possible inferences... We would be in trouble. Not necessarily, Your Honor, because there is the inference that even if it favors the defendant, the court must acknowledge it. And there is a second plausible inference that comes from this letter. It was his official notary seal. The state never explained otherwise how that would have been obtained. That's a very specific thing to have obtained otherwise. And additionally, Ms. Wantanabe's signature on the notarized letter is consistent with the checks and the other documents in the record. The G and the W of her signature are very distinctive. And that is something that she acknowledged. So further, neither the state nor Bank of America ever produced a handwriting expert. The only thing that goes against this letter is that Attorney Shuman said he did not keep a record. However, that is on his behalf, and it is one of those where today, notaries are required to keep a record. So just because he didn't remember it in that moment does not mean that it did not happen, as it did have his official notary stamp, his signature, and his business card, which he admitted were his. So what was the smoking gun that convicted your client? Why do you believe your client was convicted? I believe my client was convicted because the state put records forward and expected the preliminary hearing testimony, which is very general, does not explain any of those specific transactions, and used that lower standard of the probable cause, which is a lot more general, to try to meet the high burden of proof beyond a reasonable doubt. I believe those two combined, sir, are what ultimately convicted her. Which I will then go to. But the transcript was just one little cog. It wasn't the overwhelming reason for conviction, was it? No, Your Honor. The trial court did reference the preliminary hearing transcript multiple times, and it's like findings. So you believe it was the overriding reason for conviction? I believe that in conjunction with the records, those two combined was the reason, sir. So it wasn't harmless? It was not harmless, which the state did not argue in its brief that it was harmless, so therefore they did forfeit that affirmatively. So why didn't you address the confrontation clause concern? Absolutely. Ms. Wright had a constitutional right to confront her accuser. That right was violated when the state's substituted testimony obtained at a probable cause standard for trial testimony it could not produce. No other witness could corroborate what only Ms. Watanabe knew. And Ms. Wright never had a meaningful opportunity to cross-examine and Ms. Watanabe about the specific transactions the state used to convict her. And as I mentioned earlier, the state did forfeit any harmless error argument on this. The motive and focus of cross-examination at the preliminary hearing and the trial differed drastically because the legal standards themselves are drastically different. The preliminary hearing exists to determine probable cause. Trial exists to determine our highest standard in criminal, which is proof beyond a reasonable doubt. If those two standards were the same, there would be no need for so many steps in a criminal proceeding. Procedure would just jump straight to trial. So is it your position then that testimony from a probable cause hearing can never be admitted at trial? No, Your Honor. In this case specifically, Torres talks about the cumulative effect of the four factors. And in this case, several of them were not met. It is not that preliminary hearing transcripts cannot be used at all and cannot pass this standard, but in this case it did not meet the cumulative effect of the four factors. This case is unique because trial counsel himself said on the record, My cross-examination was geared towards a finding of no probable cause at the time, not guilt or innocence. Right, but the law is whether or not you had the opportunity to ask these questions, not whether or not you indeed asked the questions. Yes, sir, but opportunity is different than what was actually done. And so while the opportunity might have existed, that opportunity, according to Sutherland, still has to be ample. And in this case it was not. So that's ineffective assistance is what you're saying. Yes, sir, and that goes into what I will address at a later point, which is the argument and the alternative in this case, which is the either-or argument, that there are two independent paths to relief. Either path leads to the same results. Was there any question that counsel interposed that where there was an objection? No, Your Honor, there were no objections. And I know the specific case that the state cites does talk about those. However, TORAS talks specifically, going to Factor IV of the TORAS factors, that there's overt and covert restrictions, which goes specifically to this one. While no formal restrictions were imposed, there are two structural restrictions inherent in a probable cause proceeding needing no formal announcement. The first one is the probable cause standard itself that is understood at a preliminary hearing, and the second one is the scope limitation of cross-examination to the scope of direct. Neither need to be named by the court. This is something inherent in every criminal courtroom at the trial level in this country. And TORAS specifically recognized that covert restrictions are sufficient. And in this case, specifically, just for visual purposes, Your Honor, I will talk about how the preliminary hearing testimony was only 26 pages for Ms. Wantanabe. It was very limited on what was asked, including state and cross. But Krukowski, at trial, who had no personal knowledge, did 68 pages. And I'm only citing the pages for visual purposes, just to show that the lack of personal knowledge by a representative doubled with the person who had personal knowledge. It would suggest that the bank records were a whole lot more important to the prosecution than the preliminary hearing testimony. By that standard. I'm so sorry, sir. I could not hear you. By that standard, it would suggest that the bank records were a whole lot more significant in the prosecution than the preliminary hearing transcript. And you yourself just pointed out there's this big disparity in the number of pages. There is a disparity in the number of pages, and it is possible that that is something that could be very big. Like I said, I see it as they are combined, as you cannot even talk about the records and kind of what was included in them without Ms. Wantanabe talking about how she had some accounts and everything. So they are married in my mind. But her preliminary hearing testimony is just basically foundational, just kind of laying the foundation for why then all of these documents and other evidence is important. It found, at least in that case, that there was probable cause to proceed on the prosecution. No, I mean come trial. Well, come trial, sir, she was not there, and there was no foundation. That's what I'm saying. Basically, her transcript testimony really was just foundation for all of the other circumstantial evidence. Is that one interpretation at least? I'm sorry, I could not hear the last part. Is that a reasonable interpretation? It is a reasonable interpretation, Your Honor. I will go to the second question. Did you mention any specific line of questioning that could have been part of the trial that wasn't possible because of the covert restrictions in the preliminary hearing? Yes, Your Honor, and this also does touch partially on I want to talk about something I will address in Issue 3 as well, which is the competency. But I have identified several areas where trial counsel should have questioned about a lot of these but could not due to the preliminary hearing. The first one is the most obvious, which we are talking about, which is the specific transactions the State later relied on at trial. Ms. Wontemaga was not asked about a $30,052 transaction that went from Account A to Account B. That is very specific as that is something that is at the heart of this case. The money is moving, and it needed to be shown who, what, when, where, why, and it was not because she was the only one that could really speak to that. The second one is the six specific checks, Your Honor, and their memo lines. Kusatsky never asked her check by check whether she signed them, whether she intended them as a gift. That is another part of the State's case was those six checks. Then her documented pattern of forgetting, which she forgot signing the DNR, the Living Will, all those things that I mentioned earlier, less than a month after she signed them, and then directly relevant to whether she signed the notarized letter and forgot. It goes exactly to that point. That was never questioned. The fourth one is whether she filed the fraud claim herself. If she didn't, that changes everything, and trial counsel never asked. The fifth one, this will be my last one just to wrap up on this point, is the joint account. She remembered having one, but she could not recall with whom, and that account is the center of this case, and trial counsel never probed on it. I have several other examples, or would it be best if I continued on? I got the gist of what you're saying. You could have been brought out had she testified up direct. Yes, Your Honor. I will address Factor 3 of the Torres Factors, which is what counsel knew. So the State bared the burden of showing counsel had all relevant information. The record is silent on what discovery actually contained. Counsel said he had discovery, but neither he nor the State nor even the trial judge said what was included. There can be assumptions made, but there is nothing in the record that actually shows what was included at that time, and the State cannot fill that evidentiary gap with an assumption. The GAL, the guardian ad litem, was present in court, but presence does not equal knowledge of the report's contents. The limited questioning at the preliminary hearing suggests the guardian report was not available. Had it been, reasonable counsel would have questioned Ms. Watanabe about her memory decline, her powers of observation and recall, and her credibility. But trial counsel did not. The cumulative effect of what counsel did not have or could not use, the guardian report, the specific transactions, the full picture of Ms. Watanabe's memory decline, meant that he could not conduct the meaningful cross-examination the Confrontation Clause requires. Before I move on, are there any other questions about this Confrontation Clause issue? No, but we're getting down to the close of your arguments. I do want to ask, is there any questions, since I'm getting close at the end, is there any specific questions about the ineffective assistance of counsel that would like to be addressed? No. In general, we're not shy about asking questions. I appreciate it, I do. So as I mentioned earlier, Issue 2 of the Confrontation Clause and Issue 3, they are alternative arguments, and this goes down to they are two independent paths to relief. Either path leads to the same result. Ms. Wright did not receive a fair trial. If this Court finds the opportunity was inadequate under Issue 2, then Issue 3 provides a separate independent basis for reversal through counsel's other failures, not challenging competency and not objecting to hearsay. If this Court finds the opportunity was adequate under Issue 2, then Issue 3 establishes counsel was ineffective in using it. Could he have still objected to competency at trial? He could have, Your Honor, but she had already passed at that point, which would have been the issue there, which is why he was ineffective when he did not object at the preliminary hearing when he had several instances on the stand at preliminary hearing, not including the Guardian report, where she would forget questions mid-answer, specifically one about the Merrill Lynch accounts. She forgot another question mid-answer about the 11 checks, and then she could not confirm her own signature completely on Exhibit 2. She could not recall who held the joint account with her. There were several instances that should have kind of given him notice, maybe I should bring this up, which was ineffective, and also the Guardian ad litem spoke on the record. So it was obvious she was there. Reasonable counsel would have said, hmm, maybe there's something I'm missing here, and maybe I should consider this, and that also leads into the Guardian report. The interviewer noted that Ms. Wumsnarve was unsure and needed much prompting from her care provider throughout the evaluation. That is something, if he would have had that report, you would have wanted to use that to then bring the competency, and it is reasonable that the competency challenge would have actually succeeded, based on everything that was known, which is the prejudice in this case on why he did not bring it. That also goes to the second issue of his ineffective assistance of counsel, which is the failure to cross-examine. He was in front of a 98-year-old woman who clearly had declining memory. She had a Guardian ad litem. The stage was kind of set. He should have reasonably known this might have been his only opportunity to cross-examine, and that is something he should have taken and actually tried to maybe push the boundaries, as reasonable counsel would recognize she was aging, and rapidly. She was already 98. And so complete failure to impeach, the sole eyewitness in this case, when the impeachment was available, that is not trial strategy, and his failure to thoroughly cross-examine or impeach Ms. Watanabe, the sole eyewitness in this case, was objectively unreasonable. And to the final point of ineffective assistance of counsel, is that he failed to object to the Bank of America call logs, which contained hearsay within hearsay. The subjective impressions of unknown bank employees that transactions were suspicious, that Ms. Watanabe seemed confused, and that Ms. Wright called the bank when the accounts were frozen, those call logs served to fill in a weakness in the State's case, and no reasonable trial strategy justified this failure to object. The business records containing hearsay statements themselves require each statement to be admissible under its own exceptions. No exception covered the subjective employee information. The employee records include a name, a date, and a time. The State should have called those individual employees to testify to what they saw. Does it matter at all that this was a bench trial, and we are to presume that the judge only considered admissible evidence? Yes, Your Honor, that does matter. However, that goes to ineffective assistance of counsel, that he should have objected and said this is not admissible. The records themselves could come in, but we have all seen records that they come in, but there is plenty of information that cannot come in on them, because there needs to be exceptions. And that goes exactly to why when he failed to use the laws of evidence to prevent this harmful and admissible evidence from being introduced against Ms. Wright, he provided ineffective assistance of counsel. Had counsel objected, especially given the infirmities in Ms. Watanabe's testimony and counsel's failure to fully cross-examine her, the outcome could easily have been different. And all of these failures led to the consolidated prejudice against Ms. Wright under the ineffective assistance of counsel. Oh, I apologize, did I hear start of a question? No, but I think you've exhausted your time. All right, I will wrap up, sir. For those reasons, because the State used preliminary hearing testimony that violated the Confrontation Clause, it failed to prove Ms. Wright guilty beyond a reasonable doubt, and her trial counsel compounded every error at every turn, this Court should reverse her conviction, remand her a new trial, and correct the sentencing error. Thank you. Counsel, whenever you're ready. May I please declare? Counsel. My name is Matthew Connors, and I appear on behalf of the people of the State of Illinois. Justice Mitchell, you got this right. The first issue here is nothing more than a simple run-of-the-mill sufficiency of the evidence challenge. And I say that not for appellate-like bingo to talk about things like standard of review, but it's important. And the reason why it's important is because the argument that was made by defense counsel led with Ms. Watanabe's testimony from that preliminary hearing. The first thing she said to this panel was, Ms. Watanabe was an older woman who made mistakes, but she was giving money away. That was the linchpin of defense at the preliminary hearing and at trial. And it's important to know that because that undoes any other argument about Ms. Watanabe's competence, as Justice Mitchell asked, or about the content of that preliminary hearing testimony. This is what the defense wanted. They wanted to give the trier of fact a reason to believe that the defendant received all of this money. And the total amount of money that was posed to defense counsel, that $160,000, that was just the first five checks that were sent to the defendant. The total value of the foundation for all of the amounts that came in was over $950,000. The only requirement in this case- $950,000 to the defendant? Yes, there was a total amount of money between the accounts that were accessed by the defendant from cash, from transactions. There are online transfers, point of sale sales, ATM withdrawals. That is all of the items that came in, over $957,000. So almost a $1 million fraud. Correct. And yet, there's no jail time and no restitution. Sounds like counsel below did a pretty good job for the defendant. I would say so, Your Honor, in the fact that the defendant did receive the shortest possible- basically did not receive any incarceration, only a four-year period of probation, demonstrates that counsel had the opportunity to make a claim for her attorney. The defendant had no background. People can see that. But it doesn't mean that the crime did not occur. And so we look at what we required the people to establish. One, $5,000 was taken from this victim. $5,000. Defense counsel will come and say, well, we can parse out this check. Or we can say, some of these transfers are unclear. This is a repeated pattern that took place over- a little over- not even a year. That was $900,000. You'd have to go through all of these and determine none of them amount to $5,000 in order to justify a reversal of the conviction in this case. That's not borne out by the record. And what is also not borne out by the record is the argument that defense counsel has offered on appeal, which is expressly relying upon evidence that was not presented before the circuit court. Now- The GAO report. The GAO report. That is correct. Defendant is now using that as a means to challenge Ms. Watanabe's competence and the credibility of her testimony. This is simply not as inappropriate as bound by Supreme Court rules. Moreover, the people highlighted in the brief that had defense counsel wanting to get into that report, point 20, it's on page 6 of 7 of that report, states that the doctor who examined Ms. Watanabe indicated that Ms. Watanabe, in fact, did suffer from dementia. And as a result of that disorder, she was incapable of making financial decisions and incapable of making personal decisions. It was also Dr. Shaw's opinion that Grace lacks capacity, has lacked capacity over two years to engage in online banking and financial transactions. Had defense counsel tried to use this report, that sinks the entire defense. That two-year period stuns you prior to the defendant's fraud in this case. Now, in their brief, defendant relies upon the Bailey case where the victim suffered from dementia. The key distinction in that case and this case, there was an expert who testified to dementia. Now, I've reached the age now where I have doctors who tell me you have these conditions, and I'm not an expert. I know that I go there, I get my medication, and I take my medication. The cross-examination or impeachment, as counsel referenced, how do you impeach Ms. Watanabe with a doctor's report? Now, a trial defense counsel could have called the doctor, as he's done in the Bailey case, but it undercuts the entire case, which is Ms. Watanabe was just trying to give money away. That's why defense counsel didn't do it. That was the only viable defense. Let's talk about Ms. Watanabe's testimony. There's ample evidence of deception. Ms. Watanabe said, I'm capable of doing online banking. I had a computer, but I didn't do it. That's consistent with the bank records that were testified to by the Bank of America Senior Investigator. Prior to all of these transactions, that bank account did not have the number of transactions or the type of transactions. Does she also not remember whether or not she had accounts or ever gave money to the defendant? She indicated that she did give money to the defendant, but not to the amount of $160,000. She was specifically questioned about that. She said, I did not intend to give the defendant six separate checks totaling $160,000. Intend to doesn't mean that you didn't in fact do it.  That testimony could have been explored further at trial. There's nothing to say the defendant could not have testified to that, but that's not in the record. And all of these inferences must be drawn in the people's favor as Justice Leach would comment. Defense counsel has offered a number of couched terms such as possibly, probably, could have. That is nothing more than the reasonable hypothesis of innocence standard that the Illinois Supreme Court disavowed prior to the beginning of my career. Here's a long time ago. There is, defendant has the burden of demonstrating error. Defendant has the burden of saying, this conviction is improper. But the argument that's presented is that, well, I can think up other explanations or reasons for this. So then if her argument, her confrontation clause argument doesn't hold water, what about the ineffective assistance of counsel? That counsel should have barraged her with questions during the preliminary hearing until a judge shut them down. Okay, so there's an inherent tension between the two arguments. And I think that it's worth beginning with a discussion of both. Argument two is that the trial court improperly admitted the testimony because according to defense counsel, the defense attorney did not have the opportunity in similar circumstances to cross-examine the victim. Now, if we look at the record, we know that on two different occasions, defense counsel said discovery is complete. This isn't a question of what was missing. Counsel said discovery was complete. At the hearing, the victim's guardian identified herself on the record. There was no statement of shock or surprise or wonder, who is this person? Why is she here? It defies logic to believe that an attorney would sit there, not recognize that the victim in this case was represented by a member of the public guardian's office, and not push that if there was not further steps that had been taken already. How do we know that? Because prior to trial, defense counsel says the state did tender the discovery. They did not object to that matter speaking about the preliminary hearing. Moreover, prior to trial, the people indicated that they were going to file this motion to admit the preliminary hearing testimony, and they said that they were actually going to give defense counsel the victim's medical records. Again, if defense counsel did not know, which is the claim that is being made now, she would not have made these representations. So how does this trial strategy go? The trial strategy was the same one that's being advanced on appeal. Ms. Watanabe was writing checks and wanted to give her money away. If that strategy is so invalid below, it's being made again here. And this court doesn't need to go through a recitation of Strickland. But matters of trial strategy are generally immune. So they couldn't argue that she was competent to give away the money if they're now going to try to argue that, well, she was incompetent, doesn't know what she's doing or talking about. Precisely. That would undercut the argument that she voluntarily, freely gave it away. She was the new Aunt Watanabe. Yes. And good old Aunt Watanabe gave us all this money. Correct. Now, if we go to the inverse, defense counsel calls these arguments alternatives. But they're internally inconsistent. Because the second claim is that, well, defense counsel knew that this testimony was going to come in. Defendant chose to engage in this pattern of transaction with a woman who was 91 years old at the time. She was 93 at the time of the testimony. He knew that she didn't have long left to go. So defendant is now alleging on appeal, well, you should have pushed further. Implicitly, that relies on an assumption that defense counsel knew that testimony was going to come in, which thoroughly negates argument two. But it does go to the point of, well, why did counsel not push further? Counsel admitted there were no restrictions on that. But why? Because he needed that evidence. He needed the evidence of Ms. Watanabe to say, I can't remember. Why can't she remember? Because she's old. Guess what that gives him license to do? To get up and pose an argument and say, Ms. Watanabe just didn't remember. My client is here because she doesn't remember. It's all he had. It's what he went with. It's what's being presented now. To claim this ineffective assistance fails to recognize the inherent tension between the two approaches. You can't say in one hand, I was deprived of the opportunity to cross-examination. I was unduly limited. And then say, but you did not go further enough knowing that you were limited. Now, there's no way to know if it was really limited because they never asked any questions that he got shot down or prevented from asking. All of the parties were limited. I think that all of the parties, the lower court, this court, they would have preferred to have had Ms. Watanabe's testimony. It cut both ways. The people could have obviously done more than I think counsel said, 16 pages. Had this proceeded to trial, Ms. Watanabe could have presented to a greater extent. State didn't have that opportunity. And the defendant didn't have that opportunity. But what they did is they had the opportunity to use the same evidence in the best way that they could. What about as a seasoned attorney, the defense attorney knew that he would be shut down at a preliminary hearing because that's just how they go, especially in Cook County. You're going to be shut down if you go outside. I'm still suffering the trauma of my first preliminary hearing 32 years ago. You just get shut down. To the extent that there would be a question about whether or not counsel was impinged or his ability to represent a defendant was impinged by that, this is not a correct vehicle for doing that. Sorry it wasn't presented in the brief, but I just happened to know people who are spewing it over the Supreme Court in 2008. They talked about there are certain cases which are not right for appellate review for ineffective assistance of counsel on direct appeal. And why is that? Because there's necessarily matters to force the record that would be relevant. So if defense counsel's claim, which is expressly being made here, is, well, we don't know if defense counsel had that guardian's report. There's one way to find that out. You file a post-conviction petition. Defense counsel could have done that, but they can't now because they chose to raise it in this form. And they can't rely upon the Supreme Court. So we'll get another ineffective counsel. We were wrong. The court needs cases to get it. So we do have that recognition that in the absence of something affirmative in the record, the defendant doesn't assume one possible interpretation to her benefit. While disregarding the affirmative evidence, which seems to imply the fact that counsel was well aware of this, chose not to pursue because it would have wholly undermined his defense, which was, Ms. Montanari was just precarious. She just didn't realize how much money she was giving away. For God's sake, forgetfulness would be better. So there are no further questions on behalf of this court. For all these reasons and those stated in the people's brief, we ask this court to affirm the defendant's conviction and sentence. Thank you. Thank you. Counsel, whenever you're ready. First, Your Honors, I would like to acknowledge the guardian report. This court can take judicial notice of the guardian report because it was in the circuit court docket, and that is a very specific case of Cornett Insurance Co. v. Travers. Why is it in the docket? Because it wasn't presented to the trial court. It was not presented to the trial court, but because it was a hearing on its own, it was available. In the guardianship case. Yes, in the guardianship case, sir, but when you search her name, it comes up in the circuit court clerk's website. So I would like to say that you all can take judicial notice of that, first. Second, the state really harped on the number, but they're still ignoring the primary argument. They didn't answer the question of, they did not prove that it was Ms. Wright that did all of these transactions. They have nothing but mere suspicion that she did all of these transactions. They can list the number all they want, and it does meet the statutory requirement from what they allege. However, they are still missing that she had access to the accounts, that she must have had the tax identification number to do this, that she must have done this, this, and that, all of those. But again, like they said, Ms. Montanade admitted she knew how to online bank. That is something of its own. While she said at that time she didn't do it, we're going to go back to the competency, which the state really points out that that's a double-edged sword. But that goes straight into the ineffective assistance of counsel. Competency would have ended the entire trial right there, as Ms. Montanade was the only witness with personal knowledge that the state put forward about interactions between herself and Ms. Wright. That itself is prejudice. That is something that cannot be ignored simply because it's a double-edged sword. If counsel would have done that, as the state speaks, and let's say it did not succeed, then sure, there probably would have been a can of worms. But we don't know that. What we do know is that there is a reasonable probability that it actually would have succeeded. The next is the post-conviction petition, which was brought up. One, Ms. Wright... I'm sorry, Mother, your position is that the state could not have tried this case without Ms. Montanade's testimony. Yes, Your Honor. That is the position because when you take away her testimony, you are left with Attorney Shuman, who says that, you know, again, his notary stamp, his signature, his business card is there, even though he says he's never seen that document. Mm-hmm. His information is still there, his official information. And then you go to Bank of America Representative Krukowski. That was the only two people put on the stand. And as we spoke about, Krukowski could present the records and he could read from them, but all he could say was that money was transferred here and there. There's a Latin phrase that is prominent in fraud prosecutions, qui bene, who benefited. So the fact remains is that you have an elderly person with a substantial amount of money that's gone, and your client benefited. Not necessarily, Your Honor, because Ms. Montanade said herself her intention was to give money away. We're taking her out of the equation and looking only at the question that Justice Mitchell raises, who benefited. And his suggestion, and we don't have to decide, but this could have been proved without any testimony from her. My question would be, Your Honor, how? The State did not bring any other witnesses that had any other knowledge. It is their burden to prove this beyond a reasonable doubt. There were no other witnesses presented that had any personal knowledge, and that is the State's hold there on itself, that it did not actually bring that. Good old Aunt Montanade, bless her. I'm so sorry, sir. I'm a little hard of hearing. What did you say? No problem. I'm sorry. I apologize. I would like to address how the State brought up the PC petition, and this will be my last point, is that this could not necessarily be a PC petition because everything you need in the record is here. Ms. Montanade is gone. There is nothing further you could get from there. And then also, a post-conviction petition can take a long time. The alternative, if this case does want to answer whether trial counsel had the Guardian report or not, which is one of the issues, primary issues of Ms. Wright's argument, is that it could retain jurisdiction and send down for an evidentiary hearing specifically about the Guardian report. But why isn't it a sound trial strategy to just go with, hey, she forgot. She voluntarily gave us this money, and she's old, and she just forgot. She was competent at the time, but she just forgot. Why wasn't that a sound trial strategy? That was not a sound trial strategy because that goes exactly into there were several instances at the preliminary hearing that showed that she was having forgetful memory already, and that the Guardian report That just helps. If she's forgetful, that's the best argument. Then to try to go into an argument with doctors and experts and say she wasn't competent and when she made those transactions, she may have been not incompetent at the time of the preliminary hearing, but competent at the time of the transactions. So you have that possibility going in. Why is it just a sound strategy, cleanest strategy, just to say she forgot. She's old, and she forgot. Because, Your Honor, it's not a sound trial strategy when you can impeach the sole state eyewitness. And that is exactly what counsel failed to do here. He did not impeach the only eyewitness to this case. Are there any other questions, Your Honor? No, I think that covers it. Thank you very much. Thank you to counsel on both sides for excellent presentation and briefing, and that will be taken under advisement for further study. With that, we're adjourned. All rise.